FILED

NOV 16 2026

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| NANCY B. MAYLE<br><br>Plaintiff,<br><br>v.<br><br>THE VANGUARD GROUP, INC.; VANGUARD FIDUCIARY TRUST COMPANY; and TRUIST BANK,<br><br>Defendants. | ) | Civil Action No. 1:26-cv-165<br><br>JURY DEMANDED |

# COMPLAINT

## PRELIMINARY STATEMENT

Nancy B. Mayle ("Plaintiff") brings this action pro se and respectfully requests that this Court construe this Complaint liberally in accordance with Haines v. Kerner, 404 U.S. 519 (1972), and its progeny, which hold that pro se filings are to be liberally construed and held to less stringent standards than formal pleadings drafted by lawyers.

## PARTIES

1. Nancy B. Mayle ("Plaintiff") is an elderly widow and resident of the State of West Virginia, residing at 4597 Simpson Road, Grafton, West Virginia 26354. Plaintiff relies on Railroad Retirement Benefits, which serve a function similar to Social Security but are governed by a separate federal system and are the primary source of income for retired railroad workers and their surviving spouses.

2. The Vanguard Group, Inc. ("Vanguard") is a corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 100 Vanguard Blvd, Malvern, Pennsylvania 19355. Vanguard is a federally regulated financial services company

subject to the rules and regulations of the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA").

3. Vanguard Fiduciary Trust Company ("Vanguard Fiduciary") is a trust company organized under the laws of the Commonwealth of Pennsylvania, affiliated with The Vanguard Group, Inc., with its principal place of business at 100 Vanguard Blvd., Malvern, Pennsylvania 19355. Upon information and belief, Vanguard Fiduciary served as trustee, custodian and investment adviser with respect to Plaintiff's accounts described below.

4. Truist Bank ("Truist") is a national banking association, with its principal office at 214 N. Tryon Street, Charlotte, North Carolina 28202, and is a citizen of North Carolina. Truist is a federally regulated financial institution subject to the Bank Secrecy Act, Anti-Money Laundering regulations, and all applicable federal banking laws.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different states. Plaintiff is a citizen of West Virginia. Vanguard and Vanguard Fiduciary are citizens of Pennsylvania. Truist Bank is a citizen of North Carolina.

6. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) because this action involves claims arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

7. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because such claims are so related to the federal claims that they form part of the same case or controversy.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

9. Plaintiff's husband passed away on or about March 24, 2024, leaving Plaintiff recently bereaved, emotionally distressed, and financially vulnerable.

10. Federal agencies, including the Consumer Financial Protection Bureau ("CFPB"), the Financial Crimes Enforcement Network ("FinCEN"), and FINRA, have repeatedly warned financial institutions that elderly retirees—especially widows receiving fixed retirement benefits—are prime targets for romance and confidence scams.

11. Plaintiff held a 401(k) retirement account in her own name at Vanguard and was also named as beneficiary of her deceased husband's 401(k) account (the "Inherited Share"). Both accounts contained Plaintiff's life savings.

12. In the weeks following her husband's death, Plaintiff sought assistance from Vanguard regarding how to manage, transfer, or access funds from her own 401(k) and the Inherited Share.

13. On or about the beginning of April 2024, Plaintiff spoke by telephone with her Vanguard advisor and asked to withdraw $10,000. During that call, Plaintiff informed the advisor that her husband had recently died, and the advisor therefore knew that Plaintiff was an elderly, recently widowed customer. The representative explained to Plaintiff how to set up her online account to make transfers online without having to make an appointment to meet with the advisor. He did not ask the purpose of the withdrawals, explain alternatives to lump-sum distributions or their tax consequences, or recommend that Plaintiff consult an independent advisor. By steering

Plaintiff to self-service online transfers, Vanguard removed the very human review that would otherwise have accompanied her requests.

14. Vanguard, acting as custodian and recordkeeper for the accounts, processed requests that resulted in the transfer of a substantial portion of Plaintiff's funds from Vanguard to a deposit account at Truist Bank. The transfers were completed without meaningful delay and without protective measures given Plaintiff's known vulnerability as an elderly, recently bereaved widow.

15. Beginning on or about April 22, 2024—only weeks after Plaintiff's husband's death and shortly after she inherited his 401(k) account—Defendants permitted massive withdrawals and transfers of retirement funds.

16. Vanguard allowed Plaintiff to withdraw large sums of money and ignored multiple red flags of elder financial exploitation. Employees and agents of Vanguard did not advise Plaintiff of the severe consequences of liquidating her retirement funds or the devastating tax consequences associated with such withdrawals. The following withdrawals were made from Plaintiff's Vanguard accounts:

May 31, 2024: $50,000.00

July 2, 2024: $30,000.00

July 25, 2024: $34,000.00

August 21, 2024: $50,000.00

September 13, 2024: $74,999.99

October 23, 2024: $42,500.00

November 18, 2024: $76,500.00

**Total from Vanguard: approximately $357,999.99**

17. Vanguard further failed to follow SEC and FINRA investor-protection guidance, which emphasizes heightened scrutiny and protective measures for senior and vulnerable investors, including: (i) enhanced suspicious-activity monitoring, (ii) fraud warnings, and (iii) delays or escalation when red flags of elder exploitation are present.

18. Upon information and belief, Vanguard never requested a trusted contact person for Plaintiff.

19. Plaintiff was enrolled in the Vanguard Personal Advisor Services program under an advisory agreement, which was recently updated effective September 2026 (the "Advisory Agreement"), under which Vanguard agreed, for a fee, to provide ongoing investment advice and account management suited to Plaintiff's financial situation, needs and objectives. Vanguard charged Plaintiff advisory fees on May 31, 2024 ($100.44), August 14, 2024 ($249.47), and November 13, 2024 ($132.40). Each fee reflected Vanguard's ongoing advisory responsibility for the account and marked separate occasions on which Vanguard reviewed, or should have reviewed, the account and recognized activity wholly inconsistent with Plaintiff's history. As a registered investment adviser, Vanguard owed Plaintiff a fiduciary duty of care and loyalty under federal and state law, including a duty to have a reasonable understanding of her financial situation and objectives and to provide advice in her best interest, which it undertook to perform in exchange for compensation.

20. Vanguard transferred retirement funds to Truist Bank. Upon receiving the transferred funds, Truist Bank employees and agents allowed Plaintiff to make multiple large cash withdrawals without inquiring into the purpose of the withdrawals, without explaining the severe consequences of liquidating retirement funds, and without questioning the fact that these

withdrawals were wholly inconsistent with Plaintiff's ordinary transaction history. The following withdrawals were made from Plaintiff's Truist accounts:

April 22, 2024: $10,000

April 25, 2024: $10,000

April 29, 2024: $10,000

May 9, 2024: $20,000

May 13, 2024: $10,000

May 31, 2024: $50,000

July 3, 2024: $50,000

July 26, 2024: $36,000

August 23, 2024: $50,000

September 19, 2024: $80,000

October 31, 2024: $50,000

November 21, 2024: $56,500

December 11, 2024: $25,000 (personal loan from Truist)

**Total from Truist: $457,500**

21. For each of the above withdrawals from Truist Bank, Plaintiff was required to call the bank and order the funds at least two days prior to the withdrawal because Truist did not have sufficient cash on hand to fulfill the requests. This advance notice requirement provided Truist with additional time and opportunity to review the transactions, question Plaintiff regarding the purpose of the withdrawals, consult compliance personnel, and implement protective measures. Despite this built-in safeguard and repeated advance notice of large cash withdrawals by an elderly, recently bereaved customer, Truist took no protective action whatsoever.

22. Plaintiff called and spoke with a representative from Truist's Grafton branch and was advised that it would take up to two weeks to withdraw the first requested amount of $10,000 as they did not have the funds on hand and would need to order them. Plaintiff then called the Morgantown branch to order the funds and was told she could come to the branch in 48 hours to withdraw the funds. Plaintiff routinely met with Rita Newmyer and Carloa Friend. Neither representative questioned Plaintiff regarding the large withdrawals.

23. The $25,000 withdrawal made on December 11, 2024, was a personal loan issued by Truist Bank to a widow on fixed retirement income whose accounts it had watched shrink dramatically over the preceding eight months. Despite all the foregoing red flags, not a single employee or agent of Truist Bank questioned the purpose of this loan or whether Plaintiff was being exploited.

24. Because a substantial portion of the funds withdrawn from Vanguard was deposited into Plaintiff's Truist account and then withdrawn in cash, the Vanguard and Truist figures overlap. After accounting for that overlap, Plaintiff's net loss of principal is approximately $457,500, in addition to the tax losses described below. The Truist withdrawals on April 22, April 25, April 29, May 9 and May 13, 2024, which predate the first Vanguard withdrawal, came from Plaintiff's existing Truist accounts.

25. Plaintiff subsequently sent substantial sums of the withdrawn funds, in addition to her personal savings held by Truist, to an individual she met through an online romance scheme. Plaintiff later learned that she had been the victim of a romance scam and that the recipients of the funds had engaged in fraudulent conduct.

26. The transactions described herein were wholly inconsistent with Plaintiff's prior account history and risk profile, and they bore the hallmarks of elder financial exploitation as

described in industry guidance and government advisories. The transfer, rapid liquidation, immediate cash-outs, and third-party transfers were unusual and suspicious and should have triggered internal monitoring systems and mandatory reporting obligations under federal law and bank regulatory guidance.

27. Vanguard and Truist, as regulated financial institutions, maintained anti-money laundering ("AML"), Bank Secrecy Act ("BSA"), and elder financial exploitation procedures and training. Despite this, and despite the readily apparent indicators of exploitation, neither institution placed a hold on any transactions, contacted a family member or notified Adult Protective Services or law enforcement, or took any other protective step known to help Plaintiff.

28. Neither Vanguard nor Truist provided Plaintiff with clear, timely advice about the tax consequences of withdrawing or liquidating 401(k) funds, nor offered or required Plaintiff to consult an independent tax or financial advisor before permitting the catastrophic liquidation of her retirement savings.

29. Despite the numerous and escalating red flags, Truist failed to question the purpose of the withdrawals, provide scam or fraud warnings, escalate the activity internally, delay or restrict transactions, or take any reasonable steps to protect Plaintiff.

30. Defendants' failure to detect, investigate, and report these suspicious transactions, and their affirmative facilitation of transfers and cash withdrawals, directly enabled the romance-scam perpetrators to obtain Plaintiff's life savings.

31. Although Plaintiff herself requested the withdrawals, she did so while under the undue influence and control of the Fraudsters, a circumstance that the pattern of transactions made apparent to Defendants. Defendants' duties arose precisely because elderly customers who are being exploited typically request the transactions themselves; the fact that a transaction is

customer-initiated is not a safe harbor where, as here, the institution knew or should have known of the exploitation.

32. Had either Defendant delayed or placed a hold on the transactions, or contacted Plaintiff's daughter earlier, the scheme would have been exposed and stopped. As events later showed, once Vanguard froze the account and Ms. Hauck was alerted, Ms. Hauck was able to persuade Plaintiff that she had been defrauded and the transfers ceased.

33. The exploitation was discovered by Tracy Hauck ("Ms. Hauck"), Plaintiff's daughter, who then contacted both Truist and Vanguard to inquire how this pattern of exploitation was permitted to occur and why no one spoke to Plaintiff about the withdrawals and the consequences associated with them. Both institutions declined to provide meaningful information or take remedial action.

34. In or about July 2025, Vanguard contacted Plaintiff and informed her that Plaintiff's account had been suspended for potential fraud. Vanguard also telephoned Ms. Hauck and informed her that Plaintiff's account had been frozen. Vanguard's own determination that the activity warranted a fraud freeze confirms that the red flags were apparent and that Vanguard had the ability to restrict the account. Vanguard should have detected and acted on the suspicious activity when it occurred – not approximately eight months after the final withdrawal. This demonstrates that Vanguard possessed the knowledge, training, and systems necessary to identify such activity but failed to deploy them when it mattered.

35. In or about July 2025, after receiving Ms. Hauck's letter, Vanguard notified the West Virginia Securities Commission, a division of the West Virginia State Auditor's Office, of the suspected financial exploitation of Plaintiff. Brian Bane, Financial Analyst of the Securities Commission, opened a case. Vanguard's referral to state securities regulators confirms that, once

it reviewed the account activity, Vanguard readily recognized the transactions as indicative of fraud—the same activity it had processed without question for months while the withdrawals were occurring.

36. When first told of the potential fraud, Plaintiff refused to believe that she was the victim of a romance scam. The Fraudsters had convinced Plaintiff that they were stuck in Siberia and that they would pay the money back once they returned home. They cultivated Plaintiff's trust over months, instructed her to keep the relationship secret, and assured her the funds would be repaid, and Plaintiff, who was grieving and unsophisticated in financial matters, believed them. Only after multiple conversations with Ms. Hauck, and after viewing numerous accounts of similar scams, did Plaintiff realize that the Fraudsters had taken advantage of her and that Defendants' acts and omissions had contributed to her losses. Before that time, Plaintiff did not know, and in the exercise of reasonable diligence could not have known, that she had been defrauded.

37. As a direct result of Defendants' actions and omissions, Plaintiff suffered catastrophic financial losses, incurred significant tax liabilities and penalties, lost future retirement security, and endured severe emotional distress.

38. As a further direct consequence of the massive withdrawals from her retirement accounts, Plaintiff was required to pay more than $36,000 in additional federal income taxes beyond the $130,676.55 that was withheld and approximately $21,000 in state income taxes, resulting from the liquidation of tax-deferred retirement funds. Additionally, due to the surge in reported income caused by the retirement account distributions, Plaintiff's Railroad Retirement Social Security benefitsBenefits were significantly reduced by $1,300 a month, further compounding her financial devastation and depriving her of critical fixed income upon which she depends for basic living expenses.

**CLAIMS FOR RELIEF**
**COUNT I**
**NEGLIGENCE**
**(Against All Defendants)**

39. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

40. Each Defendant owed Plaintiff a duty of reasonable care arising from the special relationship described above, including Vanguard's role as Plaintiff's paid investment adviser and Truist's direct, repeated interactions with Plaintiff in arranging cash withdrawals and extending credit. The standard of care is informed by industry standards and regulatory guidance, including FINRA Rules 2165 and 4512, FinCEN Advisory FIN-2011-A003, and CFPB guidance on elder financial exploitation, as well as each Defendant's own internal policies and procedures. Plaintiff does not assert a private right of action under any of these rules or regulations; they are pleaded as evidence of the standard of care.

41. Independently, each Defendant voluntarily undertook to protect Plaintiff against financial exploitation: Vanguard by contracting, for a fee, to manage and monitor her accounts in her best interest, and Truist by requiring advance notice of each large cash withdrawal, by maintaining and representing to customers that it maintains fraud-prevention and elder-protection programs, and by underwriting and extending credit to Plaintiff. Having undertaken these protective functions, each Defendant was obligated to perform them with reasonable care, and Plaintiff relied on Defendants to do so.

42. Defendants breached their duty of care by permitting massive, repeated withdrawals and transfers of retirement funds without meaningful inquiry, without implementing safeguards appropriate for an elderly and vulnerable customer, and without providing warnings regarding the pattern of activity that bore all the hallmarks of financial exploitation.

43. Among other things, each Defendant failed to place holds or temporary restrictions on suspicious transactions, escalate concerns to compliance personnel or management, notify Adult Protective Services or other appropriate authorities, or contact a trusted family member or designated contact person, contrary to its own policies and applicable guidance.

44. Vanguard further failed to place a temporary hold on disbursements as contemplated by FINRA Rule 2165 and failed to obtain or contact a trusted contact person as contemplated by FINRA Rule 4512, even though Plaintiff was over age 65 at all relevant times.

45. Defendants' breach of duty was the direct and proximate cause of Plaintiff's catastrophic financial losses, including the loss of approximately $457,500, more than $36,000 in additional federal income taxes, approximately $21,000 in state income taxes, the loss of tax-deferred growth, and severe emotional distress.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**(Against Vanguard)**

46. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

47. Vanguard acted as Plaintiff's investment adviser under the Advisory Agreement, and as custodian and recordkeeper with respect to Plaintiff's own 401(k) account and the Inherited Share. This Count is asserted under West Virginia common law and, independently, arises from the Advisory Agreement relationship, which exists separately from any ERISA plan. To the extent the accounts were not ERISA plan assets at the time of the distributions, this Count applies in full; to the extent ERISA governs any portion of the claim, Plaintiff asserts Count VII in the alternative pursuant to Fed. R. Civ. P. 8(d)(2).

48. As a fiduciary, Vanguard owed Plaintiff duties of loyalty, care, good faith, and full disclosure.

49. Vanguard breached these fiduciary duties by:

a. Processing rapid, large-scale withdrawals and transfers shortly after Plaintiff's bereavement without implementing safeguards appropriate for an elderly, recently widowed beneficiary;

b. Failing to disclose or adequately explain the devastating tax consequences of liquidating retirement funds, including income taxation, early withdrawal penalties, and loss of tax-deferred growth;

c. Failing to explain rollover options, required minimum distribution ("RMD") rules, or alternatives to lump-sum withdrawals;

d. Failing to implement any protective measures despite the obvious indicators of exploitation.

50. Vanguard's breach of fiduciary duty was a direct and proximate cause of Plaintiff's losses.

**COUNT III**
**FAILURE TO PROTECT AGAINST ELDER FINANCIAL EXPLOITATION**
**(Against All Defendants)**

51. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

52. Federal law, state law, and industry standards impose obligations on financial institutions to detect, prevent, mitigate, and report suspected elder financial exploitation.

53. The pattern of transactions beginning April 22, 2024—including rapid liquidation of retirement assets, repeated large cash withdrawals, issuance of a personal loan followed by

immediate withdrawal, and transfers to unknown third parties—constitutes classic indicators of elder financial exploitation as identified by FinCEN, FINRA, and the CFPB.

54. Defendants failed to follow their own policies and applicable regulatory guidance by:

a. Failing to place holds or temporary restrictions on suspicious transactions;

b. Failing to escalate concerns to compliance personnel or management;

c. Failing to notify Adult Protective Services or other appropriate authorities;

d. Failing to contact a trusted family member or designated contact person.

55. Defendants' failure to protect Plaintiff enabled the continuation of the romance scam and the complete depletion of Plaintiff's life savings.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION AND FAILURE TO DISCLOSE**
**(Against All Defendants)**

56. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

57. Defendants failed to disclose material facts concerning the tax consequences of withdrawing funds from 401(k) accounts, including income taxation at ordinary rates, early withdrawal penalties, loss of tax-deferred growth, and the devastating impact on Plaintiff's long-term financial security.

58. Defendants knew or should have known that Plaintiff, an elderly widow with no financial sophistication, was relying on them for guidance following her husband's death.

59. Defendants' omissions were material, in that a reasonable person in Plaintiff's position would have considered the undisclosed information important in deciding whether to liquidate retirement savings.

60. Vanguard, as Plaintiff's paid investment adviser and fiduciary, had an affirmative duty to disclose these material facts, and its silence while processing and facilitating the withdrawals was equivalent to a representation that the withdrawals were consistent with Plaintiff's interests. Truist, having undertaken to arrange each cash withdrawal and to extend credit to Plaintiff, likewise had a duty to disclose facts within its knowledge that were material to the transactions. Plaintiff justifiably relied on Defendants' silence and would not have made the withdrawals had the undisclosed information been provided.

61. As a direct and proximate result of Defendants' negligent misrepresentations and failures to disclose, Plaintiff suffered catastrophic financial harm.

**COUNT V**
**AIDING AND ABETTING FRAUD**
**(Against All Defendants)**

62. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

63. Plaintiff was the victim of an online romance scam and related fraudulent scheme carried out by one or more unknown third parties (the "Fraudsters"), who induced Plaintiff to transfer and withdraw substantial sums of money under false pretenses. The Fraudsters' conduct constituted fraud, potential wire fraud, and financial exploitation of an elderly person.

64. Defendants had actual knowledge, or at minimum were willfully blind to the high probability, that Plaintiff was being defrauded, based on numerous and escalating red flags, including but not limited to:

a. Plaintiff's advanced age (elderly widow);

b. Recent bereavement and emotional vulnerability following the death of her husband;

c. Rapid liquidation of retirement assets shortly after inheritance;

d. Repeated large cash withdrawals wholly inconsistent with Plaintiff's prior account activity and transaction history;

e. Issuance of a personal loan followed by immediate cash withdrawal of the loan proceeds;

f. Transfers and withdrawals in patterns consistent with widely known romance-scam typologies as described in FinCEN advisories and FINRA guidance;

g. The sheer volume and rapidity of withdrawals over a short period, totaling approximately $457,500.

65. Despite this actual knowledge, Defendants substantially assisted the Fraudsters by:

a. Processing and approving large withdrawals and transfers without inquiry or intervention;

b. Allowing repeated cash withdrawals without questioning their purpose;

c. Extending credit (personal loan) that was immediately withdrawn in cash;

d. Failing to delay, block, investigate, or escalate suspicious activity;

e. Providing the financial infrastructure through which the fraud was accomplished.

66. Defendants' substantial assistance was a direct and proximate cause of Plaintiff's losses. But for Defendants' willful blindness and active facilitation, the Fraudsters could not have obtained Plaintiff's funds.

**COUNT VI**
**NEGLIGENCE PER SE / BSA/AML REGULATORY VIOLATIONS**
**(Against All Defendants)**

67. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

68. Defendants are "financial institutions" subject to the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311 et seq., and its implementing regulations, including anti-money laundering ("AML") and suspicious activity monitoring requirements.

69. As regulated financial institutions, Defendants had affirmative regulatory obligations to monitor customer transactions, investigate suspicious activity, escalate concerns to compliance personnel, and file Suspicious Activity Reports ("SARs") when warranted.

70. Plaintiff does not assert a private right of action under the BSA or its implementing regulations. Rather, under West Virginia law, violation of a statute or regulation designed to protect a class of persons from a particular harm is prima facie evidence of negligence, and the BSA, its implementing regulations and FinCEN guidance are pleaded as evidence of the standard of care applicable to financial institutions in detecting and responding to suspicious activity, including elder financial exploitation.

71. FinCEN has issued specific guidance regarding elder financial exploitation, including Advisory FIN-2011-A003 and subsequent guidance, which describe the red flags present in this case and establish reporting obligations.

72. Defendants violated these regulatory standards by failing to monitor, investigate, escalate, or report the suspicious transactions at issue in this case, despite the presence of multiple, clear indicators of elder financial exploitation.

73. Defendants' regulatory violations were a direct and proximate cause of Plaintiff's losses, as compliance with these standards would have resulted in the detection and prevention of the ongoing exploitation.

**COUNT VII**
**ERISA BREACH OF FIDUCIARY DUTY**
**(Against Vanguard)**

74. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

75. Plaintiff's 401(k) account and the Inherited Share of her late husband's 401(k) are employee benefit plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

76. Vanguard acted as a fiduciary within the meaning of ERISA, 29 U.S.C. § 1002(21), by exercising discretionary authority and control over plan administration, asset custody, and distribution processing.

77. As an ERISA fiduciary, Vanguard owed Plaintiff duties of loyalty, prudence, care, and full disclosure, including the obligation to act solely in the interest of plan participants and beneficiaries pursuant to 29 U.S.C. § 1104.

78. Vanguard breached its ERISA fiduciary duties by:

a. Facilitating rapid distribution of plan assets immediately following Plaintiff's bereavement;

b. Failing to explain rollover options, required minimum distribution rules, or alternatives to lump-sum withdrawal;

c. Failing to adequately disclose tax consequences and long-term retirement impacts;

d. Failing to implement safeguards appropriate for an elderly, recently widowed plan beneficiary.

79. Vanguard's conduct fell below the standard of care required of a prudent fiduciary acting under similar circumstances.

80. As a direct and proximate result of Vanguard's ERISA breaches, Plaintiff suffered loss of retirement assets, over $36,000 in additional federal income taxes, significant reduction in Social Security benefits due to the artificial income surge, loss of tax-deferred growth, and loss of future retirement income.

81. Plaintiff seeks all relief available under ERISA, including equitable relief, restitution, disgorgement of profits, surcharge, and restoration of plan losses pursuant to 29 U.S.C. §§ 1109 and 1132(a)(2) and (a)(3).

**COUNT VIII**
**NEGLIGENCE—FAILURE TO MEET SENIOR INVESTOR PROTECTION STANDARDS (FINRA RULES 2165 AND 4512)**
**(Against Vanguard)**

82. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

83. FINRA Rule 2165 (Financial Exploitation of Specified Adults) permits member firms to place temporary holds on disbursements of funds or securities from the account of a specified adult when the member reasonably believes that financial exploitation of the specified adult has occurred, is occurring, has been attempted, or will be attempted.

84. FINRA Rule 4512 requires member firms to make reasonable efforts to obtain the name of and contact information for a trusted contact person for customers aged 65 and older, and authorizes the firm to contact such person in circumstances involving possible financial exploitation.

85. Plaintiff was a "specified adult" under FINRA Rule 2165 at all relevant times, being over the age of 65.

86. Vanguard failed to place any temporary hold on disbursements from Plaintiff's accounts despite the presence of numerous red flags indicating financial exploitation, including the rapid liquidation of retirement assets by a recently bereaved elderly widow.

87. Vanguard failed to make reasonable efforts to obtain or contact a trusted contact person for Plaintiff, despite her age and the suspicious nature of the transactions.

88. FINRA Rules 2165 and 4512 establish the standard of care for broker-dealers serving senior investors. Vanguard's violations of these rules constitute negligence per se, or in the alternative, establish the applicable standard of care that Vanguard failed to meet.

89. Vanguard's violations of FINRA Rules 2165 and 4512 were a direct and proximate cause of Plaintiff's losses.

**COUNT IX**
**NEGLIGENT SUPERVISION AND TRAINING**
**(Against All Defendants)**

90. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

91. Defendants had a duty to adequately train their employees and agents to recognize and respond to indicators of elder financial exploitation.

92. Industry guidance from FINRA, FinCEN, the CFPB, and the SEC extensively describes the red flags of elder financial exploitation, including rapid liquidation of assets, large cash withdrawals by elderly customers, patterns inconsistent with account history, and indicators of romance-scam activity.

93. Defendants failed to adequately train and supervise their employees to recognize and respond to the clear indicators of exploitation present in Plaintiff's case.

94. Not a single employee at either institution questioned the extraordinary pattern of withdrawals by an elderly, recently bereaved widow—withdrawals totaling approximately $457,500 over a period of approximately eight months.

95. Defendants failed to implement adequate internal controls, escalation procedures, and supervisory mechanisms to prevent the financial exploitation of vulnerable customers.

96. Defendants' negligent supervision and training was a direct and proximate cause of Plaintiff's losses.

**COUNT X**
**ELDER ABUSE AND FINANCIAL EXPLOITATION UNDER WEST VIRGINIA LAW**
**(Against All Defendants)**

97. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

98. Plaintiff is an "elderly person" within the meaning of West Virginia Code § 61-2-29b and related elder-abuse and financial exploitation statutes.

99. West Virginia law prohibits the financial exploitation of elderly persons and imposes duties on persons and entities to prevent, detect, and report such exploitation.

100. Defendants knowingly or recklessly permitted the improper use, control, and dissipation of Plaintiff's funds by:

a. Allowing repeated large withdrawals and transfers without meaningful inquiry;

b. Extending credit under circumstances clearly indicating exploitation;

c. Failing to intervene or report suspected abuse to appropriate authorities.

101. Defendants failed to report suspected elder abuse and financial exploitation to appropriate authorities as required by West Virginia law and industry standards.

102. Defendants' acts and omissions constitute elder abuse and financial exploitation under West Virginia law.

103. To the extent the Court determines that the West Virginia elder-abuse statutes do not themselves supply a private civil cause of action, Plaintiff pleads them, in the alternative, as expressions of West Virginia public policy and as evidence of the standard of care applicable to Counts I and IX, and as support for punitive damages based on Defendants' reckless disregard of Plaintiff's rights.

104. Plaintiff is entitled to all available remedies under West Virginia law, including actual damages, enhanced or treble damages, punitive damages, costs, and equitable relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against all Defendants, and award the following relief:

1. Compensatory damages in an amount to be proven at trial, presently estimated at not less than $457,500, representing the funds lost as a direct result of Defendants' wrongful conduct;

2. Consequential damages, including but not limited to $36,000 in additional federal income taxes, approximately $21,000 in state income taxes, early withdrawal penalties, the significant reduction in Plaintiff's Social Security benefits caused by the artificial surge in reported income, and the lost value of tax-deferred growth that Plaintiff would have realized but for Defendants' wrongful conduct;

3. Punitive damages in an amount sufficient to punish Defendants for their willful, wanton, and reckless conduct and to deter similar conduct in the future;

4. Enhanced or treble damages as permitted under West Virginia elder abuse statutes, including W. Va. Code § 61-2-29b;

5. Equitable relief, including restitution and disgorgement of any profits, fees, or benefits Defendants obtained in connection with the transactions at issue;

6. All remedies available under ERISA, including equitable relief, surcharge, and complete restoration of plan losses pursuant to 29 U.S.C. §§ 1109 and 1132(a)(2) and (a)(3);

7. Prejudgment interest at the maximum rate permitted by law from the date of each wrongful transaction;

8. Post-judgment interest as provided by law;

9. Costs of suit; and

10. Any such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Nancy B. Mayle

Nancy B. Mayle, Pro Se
4597 Simpson Road
Grafton, WV 26354
(304) 265-4833
Dobielover222@yahoo.com

Dated: November 12, 2026